IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JACK YELLEN, et al.           :        CIVIL ACTION
                              :
        v.                    :
                              :
TELEDNE CONTINENTAL           :
MOTORS, INC., et al.          :        NO. 11-3325

MEMORANDUM

Dalzell, J.                                    December 6, 2011

        This action arises from an aviation accident that

killed Mark Yellen and Paula Moffett (collectively, the

"decedents") on May 10, 2010 when they were flying in a privately

owned aircraft.  The plaintiffs, on behalf of their decedents --

both apparently citizens of Tennessee[1] -- commenced this wrongful

death and survivor action in the Court of Common Pleas of

Philadelphia County, Pennsylvania, docketed at May Term 2011, No.

000285 (hereinafter, the "state action").

        Plaintiffs, as heirs to, or administrators of, the

decedents' respective estates, alleged state law claims of strict

liability, negligence, and breaches of express and implied

warranties against eight defendants: (1) Teledyne Continental

---

[1] As will later become pertinent, their representatives under 28
U.S.C. § 1332(c)(2) take decedents' citizenship.

1

Motors, Inc. f/k/a Teledyne Continental Motors ("TCM, Inc."),[2]
(2) Teledyne Technologies, Inc., (3) TDY Industries, Inc. a/k/a
Teledyne Industries, Inc., (4) Allegheny Technologies Inc., (5)
Allegheny Teledyne, Inc., (6) Cirrus Design Corp., (7) Cirrus
Aircraft Corp., and (8) Cirrus Industries.[3]  We will refer to
defendants one through five as the "Teledyne defendants."  Within
this subgroup, defendants three through five are herein referred
to as the "Pennsylvania defendants."  Defendants six through
eight comprise the "Cirrus defendants."  One plaintiff, Paula
Moffett's daughter -- said to be a citizen of Virginia -- asserts
a personal claim of negligent infliction of emotional distress
against all of the defendants.

On May 20, 2011, the Teledyne defendants, with the
consent of the Cirrus defendants, filed a Notice of Removal
pursuant to 28 U.S.C. § 1446 invoking our federal question

---

[2] The caption on the docket incorrectly spells "Teledyne".

[3]  There is a discrepancy over the proper names for the Teledyne
defendants in this case.  Defendants assert that: (1) TCM, Inc.
should have been sued as Continental Motors, Inc. ("CMI"), (2)
Teledyne Technologies, Inc. should have been sued as Teledyne
Technologies Incorporated, and (3) Allegheny Technologies, Inc.
f/k/a Allegheny Teledyne Incorporated (incorrectly named as a
separate defendant) should have been sued as Allegheny
Technologies Incorporated.  We adopt plaintiffs' nomenclature
herein.

jurisdiction.  Alternatively, those defendants also asserted that
we have diversity of citizenship jurisdiction and contended that
the Pennsylvania defendants were "fraudulently joined" to
improperly trigger § 1441(b)'s prohibition against removal where
at least one named defendant is a citizen of the forum state (the
"forum defendant rule").

Pursuant to 28 U.S.C. § 1447(c), plaintiffs filed their
motion to remand this litigation to the Court of Common Pleas of
Philadelphia County.  They contend that removal was improper
because this Court lacks federal question jurisdiction and the
forum defendant rule proscribes removal because the Pennsylvania
defendants were not fraudulently joined. Also under § 1447(c),
plaintiffs seek costs and fees incurred as a result of
defendants' removal.  Defendants oppose remand.

For the reasons detailed at length below, we will grant
plaintiffs' motion to remand and award plaintiffs' their costs
and fees reasonably incurred as a result of defendants' removal.

## I.   <u>Factual Background</u>

In ruling on a motion to remand premised on alleged
jurisdictional defects, "the district court must focus on the
plaintiff's complaint at the time the petition for removal was

filed ... [and] must assume as true all factual allegations of the complaint." <u>Steel Valley Auth. v. Union Switch & Signal Div.</u>, 809 F.2d 1006, 1010 (3d Cir. 1987) (citations omitted). Thus, we begin by reviewing the facts pertinent to our jurisdictional analysis as they are presented in the <u>original</u> complaint.[4]

Plaintiffs allege that: "[a]t all times material [to the allegations set forth in the Complaint,] [the Pennsylvania defendants were] the Successor[s] and Real Part[ies] in Interest to the manufacturer of certain engine assemblies in the accident aircraft and, as such, assumed all responsibility for providing overhaul, repair, replacement, inspection, and other information with respect to the engine assembly." Pls.' Compl. ¶¶ 8-10. Plaintiffs also identify the Pennsylvania defendants as among "the designers" of the engine assemblies on the accident aircraft. <u>Id.</u> ¶ 11. The Pennsylvania defendants are alleged to

---

[4]  Soon after defendants removed plaintiffs' state action complaint to federal court, they filed motions to dismiss. Following the filing of these initial motions to dismiss, plaintiffs filed an amended complaint. Defendants mistakenly assert several removal arguments based upon the amended complaint filed here, <u>see, e.g.</u>, Cirrus Defs.' Mem. of Law in Opp'n to Remand 7-8, and plaintiffs responded thereto. As the standard of review makes clear, we are obliged to limit our analysis to the original complaint. Thus, we need not address arguments related to the amended pleading.

maintain their principal places of business at 1000 Six PPG Place, Pittsburgh, Pennsylvania 15222.  Id. ¶¶ 8-10.

Plaintiffs contend that Allegheny Technologies, Inc. and/or Allegheny Teledyne, Inc. (collectively the "Allegheny corporations") were formed as the result of a merger of Teledyne, Inc. (a predecessor corporation to the modern entities) and another Pennsylvania company.  Id. ¶ 15.  Plaintiffs assert that the Allegheny corporations owned Teledyne Industries, Inc. which, until 1999, included the then-unincorporated engine manufacturing division called Teledyne Continental Motors.  Id.  In 1999, the Allegheny corporations spun off Teledyne Continental Motors putatively to shed itself of Teledyne Continental Motors's liabilities given the Allegheny corporations' alleged knowledge of defects in the engines Teledyne Continental Motors manufactured.  Id.  Furthermore, the Allegheny corporations allegedly "concealed its knowledge of defects in the accident model engine and other substantially similar engines from regulatory authorities, the public, and Plaintiffs.  As a result, the then existing engine defects perpetuated into subsequent manufactured engines."  Id.

Plaintiffs further allege that the Pennsylvania defendants and the rest of the Teledyne defendants' "disregard of

the corporate formalities, the co-mingling of corporate funds and resources, the disregard of corporate independence, and the joint venture nature of the Teledyne defendants' activities," renders them collectively liable for the tortious activities alleged in the Complaint.  Id. ¶ 18.

Each of the four counts of the Complaint that apply to the Pennsylvania defendants[5] sounds in common law claims arising under the laws of the Commonwealth of Pennsylvania.  The first count claims strict products liability against the Pennsylvania defendants as sellers and manufacturers of the allegedly defective engines.  Id. ¶¶ 54-68.  In count two, plaintiffs claim that the Pennsylvania defendants were negligent for, inter alia, designing the aircraft engine and its fuel delivery system and other components.  Id. ¶¶ 69-74.  The third count asserts that the Pennsylvania defendants breached express and implied warranties of the aircraft engines and its fuel delivery system as well as its other systems.  In the seventh count, the daughter of one of the decedents asserts a claim of negligent infliction of emotional distress against all the named defendants, including

_____

[5]  In the four counts alleged against the Pennsylvania defendants they are a subset of the named defendant group.  The Pennsylvania defendants are especially relevant to our jurisdictional analysis because their inclusion in this suit triggers the forum defendant rule.

the Pennsylvania defendants.  Id. ¶¶ 119-127.


## II.  Analysis

The federal removal statute, 28 U.S.C. § 1441(b),

provides:

> Any civil action of which the district courts
> have original jurisdiction founded on a claim
> or right arising under the Constitution,
> treaties or laws of the United States shall
> be removable without regard to the
> citizenship or residence of the parties. Any
> other such action shall be removable only if
> none of the parties in interest properly
> joined and served as defendants is a citizen
> of the State in which such action is brought.

We have already referred to this last sentence of the

removal statute as the forum defendant rule.  Section

1332(c)(1)'s definition of "citizen" is incorporated by reference

into section 1441(b), and a corporation is a citizen "of any

State by which it has been incorporated and of the State where it

has its principal place of business."  28 U.S.C. § 1332(c)(1).

Our Court of Appeals teaches that "[t]he removal

statutes 'are to be strictly construed against removal and all

doubts should be resolved in favor of remand.'"  Boyer v. Snap-on

Tools Corp., 913 F.2d 108, 111 (3d Cir. 1990) (quoting Steel

Valley Auth., 809 F.2d at 1010).  Generally speaking, a party

"who urges jurisdiction on a federal court bears the burden of proving that jurisdiction exists."  Id.

With this burden allocation in mind, we analyze the propriety of defendants' removal and so must first determine whether a removing defendant has carried its burden of showing that we indeed have federal question jurisdiction.  If a defendant meets its burden, then we would have subject matter jurisdiction and removal would be proper.[6]  If, however, we were to find no federal question jurisdiction, we would then ask if any of the "parties in interest properly joined and served as defendants  .  .  .  [are] citizen[s] of the State in which such action is brought[,]" § 1441(b) (quoting the forum defendant rule).  If there are no properly joined and served forum defendants, then removal would be proper.  If there are properly joined and served forum defendants, however, then removal would be improper and we must remand.[7]  Thus, if even one defendant

---

[6]  Some statutes expressly preclude removal of a federal question case if that case was first filed in state court.  See Richard H. Fallon, Jr. et al., Hart and Wechsler's The Federal Courts and the Federal System 392 n.5, 812 n.2 (6th ed. 2009).  No such statutes are at issue here.

[7]  One commentator has noted that, in enacting the forum defendant rule, Congress determined that protection afforded by "diversity jurisdiction is [sometimes] unnecessary because there is less reason to fear state court prejudice against the defendants if one or more of them is from the forum state."

named in an action is a citizen of the forum state in which the
action was initiated, the forum defendant rule mandates remand to
state court.   Korea Exch. Bank, N.Y. Branch v. Trackwise Sales
Corp., 66 F.3d 46, 48 (3d Cir. 1995) (holding (1) operation of
forum defendant rule waivable as procedural defect; and (2)
action was not removable because defendants were citizens of New
Jersey and case was originally filed in New Jersey state court).[8]
Although our Court of Appeals has not yet extended the
"fraudulent joinder" doctrine to alleged misuse of the forum
defendant rule, the parties argue, and our foregoing reasoning

---

Erwin Chemerinsky, Federal Jurisdiction § 5.5, at 357 (5th ed.
2005).

[8]   Once a case has been removed from state court, the federal
district court must remand the case "[i]f at any time before
final judgment it appears that the district court lacks subject
matter jurisdiction."  28 U.S.C. § 1447(c).  Our Court of Appeals
has explained that "'[b]ecause lack of jurisdiction would make
any decree in the case void and the continuation of the
litigation in federal court futile, the removal statute should be
strictly construed [when implicating questions of federal
jurisdiction] and all doubts resolved in favor of remand.'"
Brown v. Francis, 75 F.3d 860, 864–65 (3d Cir. 1996) (quoting
Abels v. State Farm Fire & Cas. Co., 770 F.2d 26, 29 (3d Cir.
1985)); see also Univ. of S. Ala. v. Am. Tobacco Co., 168 F.3d
405, 411 (11th Cir. 1999) ("A presumption in favor of remand is
necessary [when dealing with federal jurisdictional questions]
because if a federal court reaches the merits of a pending motion
in a removed case where subject matter jurisdiction may be
lacking it deprives a state court of its right under the
Constitution to resolve controversies in its own courts.").

finds _infra_ section II.B.1, that the doctrine of fraudulent joinder may apply to block the forum defendant rule's operation.

Lastly, only if we find that there is neither a federal question nor a forum defendant would we be obliged to inquire into whether a defendant has met its burden of establishing diversity jurisdiction under 28 U.S.C. § 1332. In that case, if we were to find complete diversity, we would retain jurisdiction. But if we were to find incomplete diversity as to plaintiffs and all defendants, then we must remand unless the removing party can establish that a defendant was "fraudulently joined" so as to break complete diversity and deprive diverse parties of a federal forum. Our Court of Appeals has explicitly recognized fraudulent joinder in this diversity-breaking context. _In re Briscoe_, 448 F.3d 201 (3d Cir. 2006).[9]

Remanding a case typically allows a state court to hear claims that arise under its own laws. Since "diversity jurisdiction . . . trenches upon the jurisdiction of the state courts[,]" _McSparran v. Weist_, 402 F.2d 867, 876 (3d Cir. 1968), we "cannot be expected to create new doctrines expanding state law," _Gill v. Gulfstream Park Racing Ass'n, Inc._, 399 F.3d 391,

---

[9]  Because we find that the forum defendants were not fraudulently joined, we need not reach the question of whether complete diversity exists here.

402 (1st Cir. 2005), or "torture state law into strange configurations or precipitously ... blaze new and unprecedented jurisprudential trails." Kotler v. Am. Tobacco Co., 926 F.2d 1217, 1224 (1st Cir. 1990), vacated on other grounds, 505 U.S. 1215 (1990).  The forum defendant rule also reflects this conservative balance between the judicial power vested in state courts as opposed to federal ones.

        Given this framework, we first ask whether removal is proper based on federal question jurisdiction.

### A.   **Removal Premised on Federal Question**

        Since this case does not raise an actionable federal question, we find defendants' removal to be improper.

#### 1.   **The Defendants' Arguments**

        Defendants allege that federal question jurisdiction arises in this litigation because plaintiffs' claims present such questions since they allege violations of the Federal Aviation Regulations ("FARs") in the context of aviation product liability.  Cirrus Defs.' Mem. of Law in Opp'n to Remand 9; Teledyne Defs.' Mem. of Law in Opp'n to Remand 10–18.  Defendants rely on Abdullah v. American Airlines, Inc., 181 F.3d 363 (3d Cir. 1999), to contend that the FARs pertaining to Federal

Aviation Administration ("FAA") engine certification trigger federal question jurisdiction in claims alleging liability under state tort claims. Cirrus Defs.' Mem. of Law in Opp'n to Remand 6-8; Teledyne Defs.' Mem. of Law in Opp'n to Remand 11,14.

The Teledyne defendants argue that "[p]laintiffs have pled their complaint to raise the issue of whether the FAA acted properly in certifying the two engine series with respect to the [Pennsylvania] Defendants and what entity should be liable therefor, which is a sufficient federal issue over which this Court should exercise its jurisdiction.  Federal law on FAA certification is therefore an 'essential element' of Plaintiffs' complaint, as pled."  Teledyne Defs.' Mem. of Law in Opp'n to Remand 15.[10]  The Teledyne defendants concede that "while the FAA is not a party to this action, it has a 'direct interest in the availability of a federal forum to vindicate its own administrative action[.]'"; id. 15-16 (quoting Grable, 545 U.S. at 315).

---

[10]  Specifically, they claim that "the complaint raises purely legal federal issues relating to (a) whether entities can be liable for supposedly erroneous engine certification . . . as well as (b) whether entities which may have taken part in an FAA certification process . . . are liable for later defects in performance of the engine."  Teledyne Defs.' Mem. of Law in Opp'n to Remand 11; Defs.' Not. of Removal ¶ 58.

The Teledyne defendants also read <u>Abdullah</u> to hold that Congress intended to rest "'<u>sole responsibility</u> for supervising the aviation industry with the federal government.'" <u>Id.</u> 16 (emphasis in original) (quoting <u>Abdullah</u>, 181 F.3d at 368).  They argue that "[e]xercising federal jurisdiction over this complaint will ensure that this position of sole responsibility is respected." <u>Id.</u>

The Cirrus defendants raise similar arguments.  They construe plaintiffs' argument as contending that defendants "breached standards of care set forth by federal law, and also impliedly allege that a federal agency . . . breached its responsibilities in certifying and approving these products for sale in an allegedly defective condition."  Cirrus Defs.' Mem. of Law in Opp'n to Remand 8.  They also allege that this litigation is about the FAA's "compatability with a federal statute (here, the FAA and FARs)" and the federal agency's "approval for sale and certification of the subject aircraft and its component engine[.]"  <u>Id.</u> 9.  The Cirrus defendants cite <u>Abdullah</u> for the proposition that FARs are "preemptive of any <u>state standards of care</u> in the field of aviation safety[,]" <u>id.</u> 10 (emphasis added), and conclude that "[f]or all of these reasons, this Court has subject matter jurisdiction over Plaintiff's claims."  <u>Id.</u> 11.

13

## 2.  <u>The Standard</u>

28 U.S.C. § 1441(b) allows a defendant to remove a civil action filed in state court if the federal district court has "original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States[,]" <u>see also</u> U.S. Const. art. III, §§ 1, 2, cl. 1.  The Supreme Court in <u>Caterpillar Inc. v. Williams</u>, 482 U.S. 386, 392 (1987), explained that the "'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint[,]" is the proper test to determine whether a suit "arises under" federal law for purposes of § 1331 and thus § 1441(b).  This makes the plaintiff "the master of the claim" because it allows the plaintiff to "avoid federal jurisdiction by exclusive reliance on state law."  <u>Id.</u>  But the well-pleaded complaint rule is not the end of the inquiry.  "[I]n certain cases federal-question jurisdiction will [also] lie over state-law claims that implicate significant federal issues," even if they are not raised directly.  <u>Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.</u>, 545 U.S. 308, 312 (2005) (citation omitted) (building upon <u>Merrell Dow Pharm., Inc. V. Thompson</u>, 478 U.S. 804 (1986) and its progeny).

14

To determine if a case falls within _Grable_'s more expansive federal question-eligible category, the Supreme Court has explained that courts are to inquire: "[1] does a state-law claim necessarily raise a stated federal issue, [2] [that is] actually disputed and substantial, [3] which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities[?]" _Id._ at 314.

Justice Souter's majority opinion in _Grable_ hinted that the grant of federal question jurisdiction in this posture would be "rare", _id._ at 315, and commentators at the time emphasized the narrowness of the holding and observed that "[_Grable_] would not affect usual litigation." Chemerinsky, _supra_, § 5.2.3 at 295. The next Term, the Supreme Court in _Empire Healthchoice Assurance, Inc. v. McVeigh_, 547 U.S. 677 (2006), unequivocally confirmed this point and explained that _Grable_ represents a "special and small category" of cases in which it "takes more than a federal element to open the 'arising under' door." _Id._ at 699, 701 (quoting _Grable_) (internal quotation marks omitted). Justice Ginsburg's majority opinion in _McVeigh_ limited _Grable_'s reach. She noted for the Court five factors that supported _Grable_'s holding, namely that _Grable_ "[1] centered on the action of a federal agency . . . and [2] its compatibility with a

15

federal statute, [3] the question qualified as 'substantial,'[11]
and [4] its resolution was both dispositive of the case and would
be controlling in numerous other cases[,]" and it [5] "presented
a nearly 'pure issue of law'". Id. at 700. See also Kalick v.
Northwest Airlines Corp., 372 F. App'x 317, 320 (3d Cir. 2010)
(per curiam).

    In the context of aviation litigation, our Court of
Appeals's reasoning in Abdullah informs our analysis of the
second and third factors that McVeigh seven years later
identified. Abdullah held that:

> Even though we have found federal preemption
> of the standards of aviation safety, we still
> conclude that the traditional state and
> territorial law remedies continue to exist
> for violation of those standards. Federal
> preemption of the standards of care can
> coexist with state and territorial tort
> remedies.

181 F.3d at 375 (emphasis added). Following the Supreme Court's
holding in McVeigh, our Court of Appeals has expressly
acknowledged Abdullah's continued vitality. See Elassad v.
Independence Air, Inc., 613 F.3d 119, 125 (3d Cir. 2010) ("[W]e
held [in Abdullah] that state common law remedies were still

---

[11] An issue is "substantial" if it "indicate[s] a serious
federal interest in claiming the advantages thought to be
inherent in a federal forum[.]" Grable, 545 U.S. at 313.

16

available to the injured passengers based on the specific language of the Aviation Act's savings and insurance clauses."). Thus, state common law remedies remain available in the aviation context even if the applicable standard of care is imported from the federal regulatory regime.  See John D. McClune, There is no Complete, Implied, or Field Federal Preemption of State Law Personal Injury/Wrongful Death Negligence or Product Liability Claims in General Aviation Cases, 71 J. Air L. & Comm. 717, 730 n.63 & accompanying text (2006) ("Abdullah . . . does not apply to general aviation product liability, negligence, breach of warranty, and failure to warn cases.").  Thus, making a "federal question case" out of an aviation accident requires something more than simply importing a federal standard of care.

### 3.   Application

Defendants unavailingly attempt to "squeeze[] . . . [this litigation] into the slim category Grable exemplifies," McVeigh, 547 U.S. at 701, by recasting plaintiffs' complaint as a challenge to the FAA, the Federal Aviation Act, or FARs. Defendants, however, are unable to muster a reference to one paragraph in the original complaint in which plaintiffs allegedly

17

launch, expressly or impliedly, an attack on the FAA, the Federal Aviation Act, or FARs.[12]

McVeigh is fatal to defendants' arguments.  The Supreme Court in McVeigh found that no "federal case" existed when the litigation centered on a "[fact-bound, situation-specific] reimbursement claim [that] was triggered, not by the action of any federal department, agency, or service, but by the settlement of a personal-injury action launched in state court, and the bottom-line practical issue is the share of that settlement properly payable to [the insurer][,]" id. at 700 (internal citations omitted), where the payment depended on a "contract-derived claim" governing the insured's obligation to reimburse the insurer.  Id. at 688 (emphasis added). In so holding, the Supreme Court found state courts to be the proper fora to hear common law "contract-derived" claims that were initiated by one private party against another private party, even where federal laws played a role in the background.  Id. at 683, 700-01.

This litigation is no different from McVeigh.  First, defendants admit (as they must) that we have only private

_____

[12]  We note with some amusement that, unlike typical motion to dismiss practice, defendants in opposing remand ask us to read more facts and allegations into the complaint than actually appear in that pleading.

litigants.  Second, the claims pled in the original complaint <u>all</u>

sound in state law and allege that airplane and engine designers,

testers, manufacturers, installers, and assemblers breached

duties under theories of product liability, negligence, and

negligent infliction of emotional distress, in addition to

express and implied warranties.  Since our Court of Appeals

explicitly bifurcated "standards of aviation safety" from the

"traditional state and territorial law remedies . . . for

violation[s] of those standards," <u>Abdullah</u>, 181 F.3d at 375,

Pennsylvania law applies to aviation accident cases even if the

relevant standard of care is imported from the federal regulatory

regime.[13]

---

[13]   Though defendants acknowledge <u>Abdullah</u>'s holding that the
federal standard of care preempts state standards of care in
certain sectors of the aviation industry, they overlook an
essential link in the chain from that holding to the one they
assert should apply here: that <u>any</u> state law claim adopting a
federal standard of care automatically triggers federal question
jurisdiction.  Defendants improperly conflate the "standard of
care" and "state law remedies" distinction.  Teledyne defendants
lean on <u>Abdullah</u>'s "sole responsibility" language to support this
notion, but they ignore the opinion's bifurcating language.  And
while the Cirrus defendants' submission contains a heading that
reads "Plaintiffs' State Law Claims Are Preempted By The FAA and
Regulations Promulgated Thereunder, Under Which Federal
Jurisdiction Arises[,]" their argument is only confined to a
discussion of preemption of the "federal standard of care."
Despite the label, the substance of the Cirrus defendants'
submission reflects the limits of <u>Abdullah</u>'s reasoning and their
own position.  Thus, we reject defendants' indiscriminate melding
of the standard of care with the available remedial source.

Third, though these claims arise against the backdrop of a federal aviation regulatory scheme, they sound in run-of-the-mill state tort law.  Plaintiffs' claims do not betray a serious federal interest that merits a federal forum in this litigation.  It is a fundamental premise of our federal system that state courts are "competent to apply federal law, to the extent it is relevant[.]" McVeigh, 547 U.S. at 701; see Tafflin v. Levitt, 493 U.S. 455, 467 (1990) (state courts competent to hear federal causes of action); Gulf Offshore Co. v. Mobil Oil Corp., 453 U.S. 473, 478, n.4 (1981); see also Fallon et al., supra n.4 at 392.  Furthermore, state courts routinely apply standards of care in tort cases.  This litigation fits comfortably within the state courts' realm of expertise, and if we were to retain the case we would run afoul of the "division of labor between state and federal courts" as Congress and the Supreme Court envisioned it.  See Grable, 545 U.S. at 310, 313.

Fourth, we fail to see, and defendants do not convince us otherwise, that resolution of the non-jurisdictional "questions" in this litigation would be controlling in other instances.  Defendants bear this burden, but the yoke here proves too heavy for them mainly because the fifth and final McVeigh factor demonstrates that this fatal aviation accident case is

20

inherently fact-intensive.  The defendants' submissions, for example, devote many pages to detailing corporate histories that they claim are relevant to identifying which entities are truly exposed to tort liability.  These questions alone raise issues of contract interpretation that fall within the powers and expertise of state courts and vary depending upon the parties litigating the issue.

Thus, defendants cannot demonstrate that the claims contained in plaintiffs' original complaint satisfy any of the McVeigh factors necessary to qualify the claims for Grable's federal question status.  Defendants also fail to show that plaintiffs' well-pled complaint alleges any facial basis for federal question jurisdiction.

The Seventh Circuit's persuasive reasoning in Bennett v. Southwest Airlines Co., 484 F.3d 907 (7th Cir. 2007) (Easterbrook, J.), presents the final nail in this coffin. Bennett applied the Grable line of cases to a scenario quite similar to what we have here.  Bennett was an appeal of a district court's denial of a remand for a complaint originally filed in state court by aircraft passengers and bystanders against a large commercial airline company, commercial aircraft manufacturer, and the City of Chicago alleging state law claims

21

of negligence, conscious disregard for safety, and product
liability.  The aircraft at issue overran the runway at Chicago's
Midway International Airport causing it to smash through a
barrier and a fence before finally stopping on a street where it
crushed a car and killed one of the occupants. Id. at 908.

In finding no federal question jurisdiction for state
law claims arising in the aviation accident context, Judge
Easterbrook for the panel commented on Grable and its progeny:

> The Supreme Court thought it significant in
> Grable that only a few quiet-title actions
> would present federal issues.  That enabled
> the Court to conclude that its decision would
> not move a whole category of litigation to
> federal court or upset a balance struck by
> Congress.  Things are otherwise with air-
> crash litigation: [a finding of federal
> question jurisdiction] would move a whole
> category of suits to federal court.  And it
> would upset a conscious legislative choice --
> not one made in § 1331, perhaps, but surely
> the one made when 28 U.S.C. § 1369[14] was
> enacted in 2002.  That statute permits suit
> in federal court when a single air crash (or
> other disaster) leads to at least 75
> fatalities and minimal diversity is present.
> Those lines would be rendered meaningless if
> . . . every aviation case is federal.
> Section 1369 makes sense only if
> transportation disasters are litigated in

---

[14]  Because we decide this motion to remand on other grounds, we
do not reach this statute's applicability here.

22

>     state court unless they satisfy the new
>     statute's terms.

484 F.3d at 911 (footnote added).  Judge Easterbrook cited our

Court of Appeals's reasoning in Abdullah because it "strongly

implies that the "arising under" jurisdiction is unavailable[.]"

Id. at 912.  We agree and, like the Seventh Circuit, "hold that

this is the right conclusion."  Id.  Thus, we find no federal

question jurisdiction to warrant removal.

    We turn next to the question of whether the statutory

forum defendant rule makes defendants' removal improper.

###    B.   "Fraudulent Joinder" As Basis
           For Removal to Counter Forum Defendant Rule

    As earlier noted, removal is improper if any of the

"parties in interest properly joined and served as defendants  .

. . [are] citizen[s] of the State in which such action is

brought."  28 U.S.C. § 1441(b).  If even only one defendant named

in the action is a citizen of the forum state where the action

was initiated, the forum defendant rule in § 1441(b) obliges us

to remand the action to state court.

    Though defendants[15] contend that the Pennsylvania

---

[15] The Cirrus defendants consented to the Notice of Removal and
they explicitly "incorporate[d] by reference [the Teledyne
defendants] opposition to Plaintiffs' motion to remand as it
relates to fraudulent joinder."  Cirrus Defs.' Mem. of Law in

defendants were "fraudulently joined" so as to defeat the defendants' statutory rights of removal, they mistakenly assume that we must apply the fraudulent joinder doctrine in this context.  It will be recalled that the decedents were citizens of Tennessee and all defendants are of diverse citizenship to Tennessee.[16]  To our knowledge, our Court of Appeals has never applied the doctrine when the allegedly fraudulently-joined defendant is a forum defendant whose presence in the suit triggers the removal statute's forum defendant rule <u>without</u> compromising the parties' complete diversity.  Thus, we construe the parties' fraudulent joinder arguments to beg the question of whether the fraudulent joinder doctrine should be extended to the forum defendant rule context.

Consequently, we must first determine if the doctrine applies at all to the forum defendant rule.  Surprisingly, we find it <u>does</u> apply and find support for this position in our Court of Appeals's reasoning two years ago in <u>Brown v. JEVIC</u>, 575 F.3d 322 (3d Cir. 2009).

---

Opp'n to Remand 12.  Consequently, we will refer to both sets of defendants collectively unless otherwise noted.

[16] The plaintiff asserting the personal claim is said to be from Virginia, and all defendants are of diverse citizenship to Virginia.

24

### 1.   Our Court of Appeals's
    ### Fraudulent Joinder Jurisprudence

Our Court of Appeals summarized its fraudulent joinder jurisprudence in <u>In re Briscoe</u>, 448 F.3d 201 (3d Cir. 2006):

> For a removal predicated upon diversity of citizenship, a proper exercise of federal jurisdiction requires satisfaction of the amount in controversy requirement as well as complete diversity between the parties, that is, every plaintiff must be of diverse state citizenship from every defendant.
>
> The doctrine of fraudulent joinder represents an exception to the requirement that removal be predicated solely upon complete diversity. In a suit with named defendants who are not of diverse citizenship from the plaintiff, the diverse defendant may still remove the action if it can establish that the non-diverse defendants were "fraudulently" named or joined solely to defeat diversity jurisdiction. . . . [T]his court has held that <u>joinder is fraudulent if "there is no reasonable basis in fact or colorable[17] ground supporting the claim against the joined defendant, or no real intention in good faith to prosecute the action against the defendant or seek a joint judgment</u>." If the district court determines that the joinder was "fraudulent" in this sense, the court can "disregard, for

---

[17] A ground is <u>colorable</u> if it "appear[s] to be true, valid, or right." <u>Black's Law Dictionary</u> 301 (9th ed. 2009).  As our Court of Appeals has noted, and the definition of <u>colorable</u> suggests, the fraudulent joinder inquiry does not require us to render a merits determination.  We must only decide if -- based on the law and facts -- it appears <u>possible</u> that a claim could be asserted against a defendant.  We need not inquire into the sufficiency of the pleadings, nor do we conduct a full-blown summary judgment analysis.

jurisdictional purposes, the citizenship of
certain nondiverse defendants, assume
jurisdiction over a case, dismiss the
nondiverse defendants, and thereby retain
jurisdiction."  If, however, the district
court determines that it does not have
subject-matter jurisdiction over the removed
action because the joinder was not
fraudulent, it must remand to state court [if
no other basis for subject matter
jurisdiction exists].  If warranted, the
district court's "order remanding the case
may require payment of just costs and any
actual expenses, including attorney fees,
incurred as a result of the removal."

Id. at 215-16 (emphasis added) (citations omitted) (footnote

added).

In re Briscoe demonstrates that before our Court of

Appeals's opinion in JEVIC, courts in our circuit found

fraudulent joinder only where a defendant's joinder was allegedly

invoked to defeat the complete diversity requirement.  The

limited reach of the fraudulent joinder doctrine was consistent

with the support that our Court of Appeals relied upon when it

rendered some of its earlier fraudulent joinder decisions,

starting with Abels v. State Farm Fire & Cas. Co., 770 F.2d 26

(3d Cir. 1985).  If we trace fraudulent joinder's jurisprudential

lineage, our Court of Appeals adopted its standard from Goldberg

v. CPC International, 495 F. Supp. 233, 239 (N.D. Cal. 1980).

Goldberg in turn took its support from Wilson v. Republic Iron &

26

Steel Co., 257 U.S. 92, 97 (1921) ("this right of removal cannot be defeated by a fraudulent joinder of a resident defendant having no real connection with the controversy"),[18] which itself cited Wecker v. National Enameling and Stamping Co., 204 U.S. 176, 185-86 (1907).  These three cases dealt exclusively with an allegation that the plaintiff joined a defendant to destroy complete diversity.  Goldberg, 495 F. Supp. at 236 (applying fraudulent joinder in case where "[c]omplete diversity exist[ed] between plaintiffs and the named defendants.  Some of the [Doe defendants], however, [we]re alleged to be residents of or entities organized under the laws of California.  If they [we]re treated as parties, diversity of citizenship [would be] destroyed."); Wilson, 257 U.S. at 94 (applying fraudulent joinder in case where "plaintiff and [defendant] employer were citizens of different states, the former of Alabama and the latter of New Jersey . . . [but joined defendant] coemployé was a citizen of Alabama, and was wrongfully and fraudulently joined as a defendant with the sole purpose of preventing a removal"); Wecker, 204 U.S. at 178-180 (applying fraudulent joinder where

---

[18]  The Cirrus defendants cite this exact language, but our analysis shows why these defendants take these words out of context and do not necessarily apply as they -- and plaintiffs, for that matter -- assume they do.

plaintiff sought remand "on the ground that there was not in the case a controversy between citizens of different states," where the Court's reasoning strongly implies plaintiff was citizen of Missouri and the allegedly fraudulently joined defendant was also a citizen of Missouri).  Thus, none of these foundational cases touched upon the issue presented here: whether the plaintiffs fraudulently joined the Pennsylvania defendants to improperly trigger § 1441(b)'s forum defendant rule.  Additionally, neither party points to any case where a court directly addresses this question.[19]

Nevertheless, our Court of Appeals recently expanded fraudulent joinder's reach.  In JEVIC, Judge Hardiman explained for the Court that:

> Although this appeal does not involve a
> plaintiff that fraudulently named a non-

---

[19] Our research unearthed one district court opinion that applies fraudulent joinder to facts analogous to those now here before us.  In Long v. Long, 509 F. Supp. 2d 568 (N.D.W. Va. 2007), the court granted plaintiff's motion to remand where defendants' removal was premised on diversity.  The court found that although complete diversity existed, two of the named defendants were citizens of West Virginia and were not fraudulently joined, thus § 1441(b)'s forum defendant rule obliged the court to remand.  Long rehearsed the standard required to "establish that a non-diverse defendant has been fraudulently joined in an attempt to defeat removal," Id. at 572 (emphasis added), but without further explanation applied the standard to a situation where a diverse defendant was alleged to be fraudulently joined.

> diverse party to defeat diversity
> jurisdiction, the principle enunciated in <u>In
> re Briscoe</u> applies with equal force to the
> facts of this case.  It was plainly improper
> for [plaintiff] to sue [debtor defendant] in
> state court after [debtor defendant] had
> filed for bankruptcy protection.  To the
> extent [debtor defendant's] status as a
> debtor not subject to removal deprived [other
> removal-eligible defendants] of a federal
> forum to which they were otherwise entitled,
> [plaintiff's] joinder of [debtor defendant]
> was fraudulent.

575 F.3d at 327.

We think our Court of Appeals's willingness in <u>JEVIC</u> to extend the fraudulent joinder doctrine warrants our doing so here.  The fraudulent joinder line of cases distills to a simple principle: a court cannot permit a plaintiff to join a straw-man defendant solely to deprive removal-eligible defendants of a federal forum to which they are otherwise entitled.  <u>In re Briscoe</u> and its antecedents foreclose plaintiffs from improperly impairing complete diversity to shield itself from removal. <u>JEVIC</u> forecloses a plaintiff's capacity to use federal bankruptcy law to immunize itself against removal.  In like manner, we see no reason why a plaintiff should not be foreclosed from improperly invoking the forum defendant rule to shield itself from removal.  Thus, the fraudulent joinder doctrine applies here.  We will thus draw upon our Court of Appeals's

29

jurisprudence on this subject as we extend the doctrine to the forum defendant rule.

### 2.   Fraudulent Joinder
### Mechanics: Defendants' Burden

The removing party has a "'heavy burden of persuasion'" to prove that a plaintiff has fraudulently joined a party to destroy complete diversity.  Boyer, 913 F.2d at 111 (quoting Steel Valley Auth., 809 F.2d at 1012 n.6).  One commentator has noted that "[a] contention that the plaintiff has engaged in fraudulent joinder must be asserted with particularity by the party seeking removal, and supported by clear and convincing evidence."  Charles Alan Wright et al., Federal Practice and Procedure, § 3723 & text accompanying nn.104-105 (4th ed. current through 2011 update); see, e.g., DiMichelle v. Sears & Roebuck Co., No. 97-6470, 1997 WL 793589, at *2 (E.D. Pa. Dec. 5, 1997) (Weiner, J.).

To meet this burden, a removing defendant may support its notice of removal with "evidence outside the pleadings, including such supporting documents as affidavits and deposition transcripts, in defendant's attempt to satisfy its burden of establishing fraudulent joinder."  Wright et al., supra, § 3723 n.107 & accompanying text (citing In re Briscoe, 448 F.3d 201 (3d

30

Cir. 2006)).  Our Court of Appeals has allowed <u>limited</u> piercing

of the complaint's allegations, and was at pains to stress that

this inquiry is "far different from the summary judgment type

inquiry."  See Boyer, 913 F.2d at 112.[20]

In Boyer, our Court of Appeals identified Smoot v.

Chicago, Rock Island & Pacific R.R. Co., 378 F.2d 879 (10th Cir.

1967), as a model for limited piercing of allegations to discover

fraudulent joinder.  In Smoot, the Tenth Circuit noted that

limited piercing "does not mean that the federal court will pre-

try, as a matter of course, doubtful issues of fact to determine

removability; the issue must be capable of summary determination

and be proven with complete certainty."  Id. at 882 (internal

quotation marks omitted) (emphasis added).  The Smoot plaintiff's

complaint advanced a negligence claim against a railroad employee

whose joinder destroyed complete diversity.  When the railroad

removed to federal court on fraudulent joinder grounds, it argued

that the railroad employee was not an employee and agent of the

railroad at the time alleged in the complaint.  In support

thereof, the railroad attached the named employee's affidavit in

---

[20]  Defendants' notice of removal misapprehends our Court of
Appeals's clear teaching on the remand standard.  Defs.' Not. of
Removal ¶¶ 30-31.  Despite defendants' invocation of the motion
to dismiss standard, we do <u>not</u> apply this standard to a remand
inquiry.

which he swore that the railroad had terminated him "almost fifteen months before the collision", id. at 881; thus, he could not have been "connected with the acts attributed to him."  Id.  Moreover, plaintiff did not deny the allegations of the affidavit.  The Tenth Circuit held that "[t]he non-liability of [the employee] having been established with complete certainty upon undisputed evidence, it was then subject to summary determination[.]"  Id. at 882.

### 3.   Defendants' Arguments

The Teledyne defendants devote considerable attention to the fraudulent joinder issue.  They attack the joinder on two grounds.  They contend in both the Notice of Removal and their Response in Opposition to Plaintiffs' Motion to Remand that (1) no viable cause of action exists against the Pennsylvania defendants, and (2) no reasonable basis in fact or colorable ground supporting the claim against the Pennsylvania defendants exists because the Pennsylvania defendants allegedly ceded all liability to other entities pursuant to subsequent asset and liability transfer agreements and corporate reorganizations.

As will be seen, defendants fail to carry their "heavy burden" of showing that the Pennsylvania defendants were

fraudulently joined.  Specifically, under the facts in the record
that we reviewed for our inquiry, defendants' failed to show that
(1) plaintiffs' negligent design claim against non-manufacturing,
non-selling defendants is <u>not</u> viable under Pennsylvania law, and
(2) there is "no reasonable basis in fact or colorable ground" in
support of plaintiffs' negligent design claim.[21]

### a.    <u>The Viability of the Cause of Action</u>

#### (1)  <u>Defendants' Argument</u>

The Teledyne defendants assert that:

> [S]ince there is no valid cause of action
> against a defendant that allegedly designed
> an engine many years ago, but no longer owns
> the business and, in fact, ceased owning the
> business almost six years before the engine
> was manufactured or sold -- the joinder is
> fraudulent. . . . There is no liability under
> the causes of action asserted by Plaintiffs
> against an entity that neither manufactured
> nor sold the engine in question.

Teledyne Defs.' Mem. of Law in Opp'n to Remand 5; <u>see also</u> Defs.'
Not. of Removal ¶¶ 52-55.  The Teledyne defendants further argue

---

[21]  Even if fraudulent joinder were not applicable in the forum
defendant rule context, defendants' argument still fails.
Plaintiffs' complaint identifies TDY, Allegheny Technologies, and
Allegheny Teledyne as corporations that maintain their principal
places of business at 1000 Six PPG Place, Pittsburgh,
<u>Pennsylvania</u> 15222. Pls.'s Compl. ¶¶ 8-10.  On these facts alone,
the removal statute's plain language would oblige us to remand
this case.  <u>See Trackwise Sales Corp.</u>, 66 F.3d at 48.

that "the allegations of negligent design against TDY Industries, Inc. do not establish a colorable legal cause of action in the first place against an entity that did not manufacture or sell the engine[.]" Teledyne Defs.' Mem. of Law in Opp'n to Remand 5.[22]  In fact, they assert that "Plaintiffs have cited no decision from Pennsylvania (or any other court) where a defendant that did not manufacture or sell an engine was held liable for a design defect regarding that engine . . . . [instead plaintiffs cite <u>Cox v. Shaffer</u>, 302 A.2d 456 (Pa. Super. Ct. 1973) (<u>per curiam</u>)] which acknowledge[s] the existence of liability for a design defect <u>of a defendant which manufactured and sold the allegedly defective engine</u>".  <u>Id.</u> at 8 n.5 & accompanying text (emphasis in original).

The Teledyne defendants also contend that Pennsylvania state law and Restatement (Second) of Torts § 402A forecloses strict products liability claims and those alleging breaches of express and implied warranties against a party that is neither a manufacturer nor a seller.  <u>Id.</u> 6-7; Defs.' Not. of Removal ¶¶ 53-54.

---

[22]  Because we decide this litigation on another basis, we need not reach defendants' argument refuting plaintiffs' "alter-ego" liability theory.

(2)    **Application**

Defendants' contention that plaintiffs have not asserted a viable negligent <u>design</u> claim against the Pennsylvania defendants does not persuade.  As an initial matter, the Teledyne defendants misapprehend which party in this litigation bears the burden of showing that there is "no reasonable basis in fact or colorable ground supporting the claim against the joined defendants."  While it may be true that plaintiffs do not cite a source of Pennsylvania law where a non-manufacturer or seller is found to be liable for a design defect, the onus is not on <u>plaintiffs</u> to prove this point.  To the contrary, defendants bear the burden of showing that a non-manufacturer or non-seller is free of liability because <u>removing defendants</u> have the burden of showing that removal is proper on fraudulent joinder grounds. See Boyer, 913 F.2d at 111.  The case law and the fraudulent standard's plain language impose defendants' burden, as only defendants have the motivation to show that "no reasonable basis in fact or colorable ground" exists.

Second, <u>Cox v. Shaffer</u>, 302 A.2d at 457,[23] recognizes

_____

[23]  Plaintiffs specifically allege that at least one of the Pennsylvania defendant's knowledge of this defect motivated the defendants' corporate reorganizations. <u>See, e.g.</u>, Pls.' Compl. ¶ 15 ("due to the knowledge of defects in engines manufactured by TCM and its growing liabilities, the Allegheny Teledyne companies

negligent design liability under Pennsylvania law so long as
"defendant knew or should have known of the defect."  Defendants'
submission mistakenly conflates Pennsylvania's strict products
liability and negligent design defect jurisprudence.  The
Superior Court of Pennsylvania has recently stated that
"[p]ursuant to Pennsylvania law, a negligent design defect claim
is considered to be distinct from, and not subsumed within, a
strict liability design defect claim."  Lance v. Wyeth, 4 A.3d
160, 166 (Pa. Super. Ct. 2010).  Defendants correctly note that
Pennsylvania only holds manufacturers and sellers strictly liable
under a theory of products liability, but neither Pennsylvania
law nor defendants' arguments mandates that the same also holds
under a negligent design defect theory.  See id.  Lance only
states that the Pennsylvania Supreme Court expressly adopted The
Restatement (Second) of Torts § 402A's endorsement of strict
products liability against sellers.  Though Lance observes that §
395 addresses negligent design liability against manufacturers,
the Superior Court did not state that the Pennsylvania Supreme
Court expressly adopted § 395 (pertaining to negligent design
liability against manufacturers).  Nor does Lance, or any other

---

spun off TCM purportedly to shed itself of liabilities" and
"Allegheny concealed its knowledge of defects in the accident
model engine and other substantially similar engines").

36

Pennsylvania opinion that we have found, hold § 395 to be the final word on the Commonwealth's negligent design liability law.

Though defendants are correct that <u>Cox</u> holds a builder/manufacturer liable under the facts of that case, we cannot agree that the court's finding of builder/manufacturer liability logically precludes non-manufacturer or non-seller liability.  There is no reasoning in <u>Cox</u> to suggest such an outcome, and our review of the <u>Summary of Pennsylvania Jurisprudence</u> suggests that the opposite conclusion is correct: "A duty of care extends to designers of a product which have <u>no part</u> in the actual manufacture of that product and to designers and manufacturers of the process by which a product is manufactured."  3A <u>Summary of Pennsylvania Jurisprudence Torts</u> § 41:176 (2d ed. current through October 2011) (emphasis added). Taking our cue from page nine of the Teledyne defendants' Response in Opposition to plaintiffs' motion to remand, we will refrain from "creat[ing] new doctrines expanding state law," <u>see Gill</u>, 399 F.3d at 402, nor will we "tortur[e] state law into strange configurations or precipitously . . . blaze new and unprecedented jurisprudential trails".  Indeed, we believe precisely such outcomes could follow if we accepted defendants' construction of Pennsylvania negligent design defect tort

37

liability.  See Kotler, 926 F.2d at 1224; Teledyne Defs.' Mem. of Law in Opp'n to Remand 9.[24]

### b.   The "Ceded All Liability" Contention

#### (1)   Defendants' Argument

The Teledyne defendants argue that the Pennsylvania defendants ceded all of their liability to other entities through a complex history of asset and liability transfer agreements and corporate reorganizations, such that "[n]one of the [Pennsylvania] Defendants had any association with TCM[, Inc.] at the time the engine in question was manufactured and sold." Defs.' Not. of Removal ¶¶ 36-51.  This attempt to shoehorn this case into the Smoot footprint will not work.

In support of their "no liability" argument, defendants rely upon Ms. Melanie S. Cibik's declaration.  Cibik is the Vice President, Associate General Counsel, and Assistant Secretary for Teledyne Technologies Incorporated.  Based upon her personal knowledge and review of business records, she opines that in 1999 Teledyne Technologies Incorporated:

---

[24]  Because we find plaintiffs are not precluded from asserting a negligent design claim against the Pennsylvania defendants, we do not reach the viability of plaintiffs' strict products liability, breach of express and implied warranties, and negligent infliction of emotional distress claims against the Pennsylvania defendants.

> [A]cquired the assets and liabilities of
> Teledyne Continental Motors - Piston
> Engines[, an unincorporated subdivision of
> one of the Pennsylvania defendants, pursuant
> to the terms of a Separation and Distribution
> Agreement].  As part of that transaction,
> Teledyne Technologies Incorporated assumed
> responsibility for liabilities of general
> aviation piston engines production by
> Teledyne Continental Motors when it was part
> of Teledyne Industries, Inc. (one of the
> [Pennsylvania] Defendants).

Cibik Decl. ¶ 9.  Then, in 2001, Teledyne Technologies

Incorporated's Teledyne Continental Motors - Piston Engines

division's assets were transferred to TCM, Inc. and TCM, Inc.

assumed all "responsibility for the potential liability of the

former Teledyne Continental Motors - Piston Engines division

arising from the operation of the business[,]", "including but

not limited to any liabilities that may have arisen before

December 1999[.]"  Id.  ¶ 12.  Following this transaction, and

pursuant to a December 11, 2010 Purchase Agreement, "Teledyne

Technologies Incorporated completed the sale of all issued and

outstanding capital stock of Teledyne Continental Motors, Inc. .

. . to Technify Motor (USA) Inc. [on April 19, 2011]".  Id. ¶ 14.

Soon thereafter, TCM, Inc. changed its name to Continental

Motors, Inc. ("CMI"), and "CMI retained all liabilities for any

aviation product liability claims asserted against CMI before or

after the sale that occurred on April 19, 2011." <u>Id.</u> (emphasis added).

### (2)   <u>Application</u>

First, it is difficult to reconcile the Teledyne defendants' similar, but significantly divergent, statements in their Notice of Removal and Memorandum of Law in Opposition to Remand.[25]  In the Notice of Removal, defendants allege that CMI retained all "aviation product liability claims" exposure brought against itself before and after a certain date, but in their subsequent statement they allege that CMI retained all "aviation

---

[25] <u>Compare</u> Defs.' Not. of Removal ¶ 55 (emphasis added) ("CMI retained all liabilities for <u>any aviation product liability claims asserted against CMI</u> before or after the sale that occurred on April 19, 2011. . . . CMI has assumed any and all liabilities asserted by Plaintiffs in this case against TCM[, Inc.], Teledyne Technologies Incorporated and the [Pennsylvania] Defendants whether Plaintiffs' claims are based on strict liability, negligence, breach of express or implied warranties, or negligent infliction of emotional distress") <u>with</u> Teledyne Defs.' Mem. of Law in Opp'n to Remand 8 (emphasis added) (citing Cibik Decl. ¶¶ 12, 14) ("CMI retained all liabilities for <u>any aviation liability claims</u> <u>arising from the operation of Teledyne Continental Motors</u> before or after the sale that occurred on April 19, 2011. . . . CMI has assumed any and all liabilities asserted by Plaintiffs in this case against TCM[, Inc.], Teledyne Technologies Incorporated, and the [Pennsylvania] Defendants whether Plaintiffs' claims are based on strict liability, negligence, breach of express or implied warranties, or negligent infliction of emotional distress.").

liability claims," generally.  If the defendants cannot assert with any degree of consistency which liabilities CMI retained (and, by implication, which liabilities may or may not have remained with the Pennsylvania defendants), we cannot come to a Smoot-like conclusion that there is "no reasonable basis in fact or colorable ground supporting" plaintiffs' claims against the Pennsylvania defendants.

Second, if we pierce plaintiffs' allegations á la Smoot, we find that the Teledyne defendants' reliance on the Cibik Declaration fails to foreclose the Pennsylvania defendants' liability with any degree of certainty.  One can hardly characterize plaintiffs as leaving these factual allegations unchallenged as they were in Smoot.  Pls.' Mot. to Remand 5 ("As for TDY . . . [one of the Pennsylvania defendants], it is the corporate entity directly responsible in tort for the negligent design of the IO-550-N engine[.]").[26]  Unlike the plaintiff in Smoot, plaintiffs here indeed contest the Cibik Declaration and the Teledyne defendants' assertion that the Pennsylvania defendants retain no liability.

---

[26]   The Oxford English Dictionary defines responsible as "liable to be called to account."  XIII The Oxford English Dictionary 742 (2d ed. 1989).

Cibik's own words preclude us from holding that the Pennsylvania defendants have no liability exposure.  At best, Cibik's statements are ambiguous about what liabilities were and were not transferred.  It is by no means clear what the locution "liabilities of general aviation piston engines production" includes or excludes.  Rather to the point, the language does not resolve where negligent design liability is included within this "production" category.

Furthermore, the two subsequent liability transfer transactions appear to be premised on this initial liability transfer.  Thus, analyzing these later transactions sheds little light on what, if any, liability remains with the Pennsylvania defendants.  Nevertheless, Cibik's statements on these subsequent transactions are similarly ambiguous about what liabilities were and were not transferred when TCM, Inc. assumed "liability . . . arising from the operation of the business."  In addition, Cibik's concluding remark by strong implication leaves the door open for plaintiffs' contention that the Pennsylvania defendants retain tort liability for negligent design.  She declares only that "CMI retained all liabilities for any aviation <u>product liability</u> claims."  As our analysis above shows, product liability and negligent design are distinct sources for tort

liability under Pennsylvania law.   Thus, Cibik's statement undermines defendants' contention that the Pennsylvania defendants ceded all their negligent design liability.   Based on Cibik's Declaration, we cannot "establish with complete certainty upon undisputed evidence" that the Pennsylvania defendants have no liability exposure under a theory of negligent design.   See Smoot, 378 F.2d at 882.

### C.    Plaintiffs' Request for Fees and Costs

Lastly, plaintiffs urge us to award them the fees and costs they incurred as a result of defendants' removal.   The removal statute provides that a remand of a case to state court "may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." 28 U.S.C. § 1447(c).   Our Court of Appeals in Mints v. Educational Testing Service, 99 F.3d 1253, 1260 (3d Cir. 1996), held that "a district court has broad discretion and may be flexible in determining whether to require the payment of fees under section 1447(c)."   The removal need not have been improvident or in bad faith to justify an award of fees.   Id.

The Supreme Court has elaborated on the standard we are to apply, holding that:

> [T]he standard for awarding fees should turn
> on the reasonableness of the removal.  Absent
> unusual circumstances, courts may award
> attorney's fees under § 1447(c) only where
> the removing party lacked an objectively
> reasonable basis for seeking removal.
> Conversely, when an objectively reasonable
> basis exists, fees should be denied.

Martin v. Franklin Capital Corp., 546 U.S. 132, 141 (2005).  The

Court also explained that this standard "recognize[s] the desire

to deter removals sought for the purpose of prolonging litigation

and imposing costs on the opposing party, while not undermining

Congress'[s] basic decision to afford defendants a right to

remove as a general matter, when the statutory criteria are

satisfied."  Id. at 140.

Defendants collectively had no objectively reasonable

basis for seeking removal here.  Defendants' federal question

arguments ignore our Supreme Court's teaching in McVeigh. Their

notice of removal and subsequent filings mischaracterize

plaintiffs' complaint as challenging the FAA, the Federal

Aviation Act, and FARs, and fail to identify a single paragraph

in the original complaint to substantiate these contentions.

Defendants also ascribe no significance to the fact that this

litigation involves purely private parties.  Defendants ignore

our Court of Appeals's separation of the applicable standard of

care owed in the aviation context from the continued viability of traditional state law remedies.

Defendants' fraudulent joinder arguments repeatedly and mistakenly conflate Pennsylvania law's strict product liability and negligent design liability, leading them to misstate Pennsylvania law.  They misconstrue the removal burden allocation and argue that plaintiffs, and not they, have the duty to prove that removal was proper.  Defendants' allegation-piercing arguments also rely upon a Declaration that is riddled with inconsistences and ambiguities that preclude us from a <u>Smoot</u>-like finding that the Pennsylvania defendants themselves retain no liability.

Given defendants' lack of an objectively reasonable basis to remove this action, we find it all the more surprising that the two different sets of defendants actually have endorsed each other's submissions in this matter.  Defendants' lack of objective evaluation of each other's submissions prolonged this litigation and imposed costs both on the opposing parties and on themselves.

Thus, the Order accompanying this Memorandum will oblige plaintiffs to promptly file a fee petition accounting for "just costs and any actual expenses, including attorney fees,

incurred as a result of the removal," that they incurred in preparing the motion to remand, motion to stay and the first set of responses in opposition to the Teledyne and Cirrus defendants' respective motions to dismiss.[27]  Given both defendants' active involvement in this matter, they will share equally in the division of these fees and costs.

BY THE COURT:


__\s\Stewart Dalzell

_____

[27]  Ordinarily, we would limit fee-shifting to the reasonable legal services incurred solely in connection with the motion to remand.  But here, where the first motion to dismiss was filed seven days after removal, plaintiffs had to respond on pain of our treating the Rule 12 motions as unopposed under our Local R. Civ. P. 7.1(c).  Thus, those expenses were bound up with defendants' improvident removal.  The amended complaint and services associated with it are, however, another matter that we will not encompass in the fee-shifting.